**FISHER–PRICE, INC.,**
**Plaintiff–Appellee,**

v.

**WELL–MADE TOY MANUFACTURING CORP., Defendant–Appellant.**

**No. 660, Docket 93–7347.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 1994.

Decided May 27, 1994.

**120**

Gerard F. Dunne, New York City (Barry L. Mendelson, Altieri, Kushner, Miuccio & Frind, New York City, of counsel), for defendant-appellant.

Frank T. Gaglione, Buffalo, NY, (Lawrence A. Schultz, Saperston & Day, Buffalo, N.Y., of counsel), for plaintiff-appellee.

Before: MINER and McLAUGHLIN, Circuit Judges, and CONNER, District Judge.*

McLAUGHLIN, Circuit Judge:

Fisher–Price, Inc., a toy manufacturer, owns the copyrights to "Puffalump Kids" baby dolls and "Baby Puffalumps" mouse dolls. In 1992, Fisher–Price learned that Well–Made Toys, a smaller toy manufacturer, was creating similar looking dolls for the upcoming Christmas season. Fisher–Price sued Well–Made in the Western District of New York for copyright infringement and sought a preliminary injunction. The district court (John T. Elfvin, *Judge* ) granted the injunction.

Well–Made now appeals. It argues that Fisher–Price failed to demonstrate a likelihood of success on the merits of its infringe-

---

* Honorable William C. Conner, of the United States District Court for the Southern District of New York, sitting by designation.

ment claims. It further contends that Fisher–Price's six-month delay in filing suit rebutted the presumption that the dolls would irreparably harm Fisher–Price.

We hold that: (1) Fisher–Price demonstrated that Well–Made likely copied the Puffalump Kids human doll illegally, but not the Baby Puffalumps mouse doll, and (2) Fisher–Price's delay in filing suit does not rebut a finding of irreparable harm with respect to its Puffalump Kids copyright. Thus, we affirm that part of the order which enjoins Well–Made from manufacturing or selling the baby doll; but we vacate the part enjoining the manufacture or sale of the mouse doll.

## BACKGROUND

Fisher–Price is a well-known designer and manufacturer of children's toys. In 1985, it hired Alberts Design Company to help it create a new soft-sculptured rag doll, and Alberts fashioned a set of seven large animal dolls that Fisher–Price liked. The dolls featured disproportionately large limbs and heads, and were covered with a satiny, crinkly material. They were also understuffed to make them more embraceable. Having slightly revised Alberts' models, Fisher–Price dubbed the animal dolls "Puffalumps," and obtained copyrights for them.

The Puffalumps dolls sold well, inspiring Fisher–Price to develop variations on the theme. Two Fisher–Price designers engendered a set of smaller, younger-looking versions of the Puffalumps animals, calling them "Baby Puffalumps." The designers created Baby Puffalumps in four species: mouse, dog, bear and rabbit. The Baby Puffalumps dolls were brought to market in January 1988, and were copyrighted the following July.

Fisher–Price also used the original Puffalumps to develop a line of dolls called "Puffalump Kids." While Puffalump Kids' bodies were also understuffed and covered with the same fabric as the original Puffalumps, Puffalump Kids had metamorphosed into human forms. And, whereas the animal Puffalumps were frozen in a sedentary position, the Puffalump Kids had short, squat, dangling legs

that made them appear to stand when held up. The human dolls' faces were made from soft vinyl, instead of fabric, and were endowed with an angelic countenance created specially by Alberts.

Fisher–Price copyrighted the Puffalump Kids design in 1990, and began showing these dolls at trade shows by the end of that year. Within a year, Puffalump Kids were the top-selling soft-bodied rag doll on the toy market. Capitalizing on this, Fisher–Price put out seasonal Puffalump Kids—essentially the same doll, but now adorned with Christmas and Easter trappings.

In June 1992, Fisher–Price heard a disquieting rumor: Well–Made was developing a Christmas baby doll that closely resembled the Puffalump Kids Christmas doll. To investigate, Fisher–Price commissioned its salesforce employees to try to acquire Well–Made Christmas dolls.

Initially, the search for a Puffalump pretender bore little fruit. On September 29, a Fisher–Price employee bought a Well–Made "Tender Tots" mouse doll at a department store in upstate New York; but this was not the copy that Fisher–Price sought. On November 11, another employee found an oversized Well–Made "Dolly Mine" doll in a Woolworth's in California. This doll resembled a Puffalump Kids doll, but was about seven inches longer. Finally, on November 29, Fisher–Price's quest ended: an employee bought a regular-sized Well–Made "Baby Dolly Mine," apparelled for Christmas, from a supermarket in New Jersey.

Over the next week, Fisher–Price subjected Well–Made's Christmas doll to intense external and internal study. After disassembling the doll and comparing the pieces to Fisher–Price's own patterns, Fisher–Price concluded that Well–Made had copied its doll from a Puffalump Kids Christmas doll.

Shortly after Fisher–Price examined the Christmas Baby Dolly Mine, Alberts interviewed Suzanne Roman, a former Well–Made employee, for an artist position. Fortuitously, Roman's portfolio contained several catalog sheets of Baby Dolly Mine dolls that closely resembled Puffalump Kids dolls. Al-

berts photocopied the sheets and faxed them to Fisher–Price.

On December 17, the same day it received the fax from Alberts, Fisher–Price sued Well–Made for copyright infringement and sought a permanent injunction. Fisher–Price also asked for a preliminary injunction to prevent Well–Made from selling or manufacturing dolls that were substantially similar to Fisher–Price's, pending the trial of its permanent injunction claim. Well–Made opposed the preliminary injunction, challenging the validity of Fisher–Price's copyright, and claiming that, in any event, Well–Made did not copy from Fisher–Price's dolls and that the dolls were sufficiently distinct to avoid infringement.

The district court conducted a week-long injunction hearing. In addition to proof of its valid copyrights, Fisher–Price introduced testimony from its employees that Well–Made's Baby Dolly Mine dolls not only looked identical to Fisher–Price's, but were also made from nearly identical patterns.

Critical testimony also came from Roman, the former Well–Made designer. She testified that, while at Well–Made, she heard Well–Made president Fred Catapano say that he was sending a Puffalump Kids doll to a factory in China for copying. She added that, after the Chinese copy had been made, Catapano bragged to her that the dolls were indistinguishable. Roman also testified that Catapano had, on occasion, given her other top-selling dolls (such as Raggedy Ann and Andy) for her to copy. Roman related how Catapano had instructed her to make the imitations appear very similar to the originals, but to possess minor differences that would become manifest upon close inspection.

For its part, Well–Made called Catapano as a witness. Catapano tarred Roman as a disgruntled employee, and denied making any of the statements she attributed to him. Well–Made also called Josie Lai, the manager of Well–Made's design factory in China. Lai stated that she saw a Well–Made employee create Dolly Mine from independent sketches. On cross-examination, however, Lai conceded that Well–Made's designers sometimes used competitors' dolls as references.

The district court found that Fisher–Price possessed valid copyrights to the Puffalump Kids and Baby Puffalump dolls; that Fisher–Price would likely be able to prove that Well–Made had copied the original elements of these dolls; and that Well–Made's dolls were substantially similar to Fisher–Price's. The court also noted that irreparable harm, a prerequisite for issuing an injunction, was presumed in copyright infringement cases.

The district court then preliminarily enjoined Well–Made "from manufacturing, importing, distributing, selling, vending, offering, promoting or advertising ... its Dolly Mine, Tender Tots or any other product" that is substantially similar to the Puffalump Kids baby dolls or the Baby Puffalumps animal dolls while the lawsuit was pending.

Well–Made now appeals.

## DISCUSSION

■ To obtain a preliminary injunction, a plaintiff must demonstrate: (1) *either* a likelihood that he will succeed on the merits of his claim, *or* that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim. *See Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 135–36 (2d Cir.1992); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985). We review the decision to issue a preliminary injunction for abuse of discretion. *Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966).

### I. *Likelihood of Success*

■ Well–Made argues that the district court abused its discretion by finding that Fisher–Price would likely succeed on its copyright infringement claims. We find success likely as to the human, but not the mouse.

■ A plaintiff with a valid copyright proves infringement by demonstrating that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists be-

tween the defendant's work and the protectible elements of plaintiff's. *See Laureyssens,* 964 F.2d at 140.

Well–Made no longer contests, as it did below, that Fisher–Price owns valid copyrights to the Puffalump Kids dolls. Thus, we focus on the evidence of copying and substantial similarity.

The plaintiff may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work. *See id.* (citing Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187, 1214 (1990)). In the context of deciding whether the defendant copied at all (as distinguished from whether it *illegally* copied), "similarity" relates to the entire work, not just the protectible elements. *Id.*

At the hearing, Fisher–Price presented direct evidence that Well–Made copied its Baby Dolly Mine from the Puffalump Kids doll. Suzanne Roman, the former Well–Made employee, testified that Well–Made's president told her he was having a Puffalump Kids doll copied, and that he later boasted about how similar Well–Made's imitation was to the Puffalump Kids doll. While Well–Made's president denied making these statements, the district court found Roman more credible, and Well–Made has offered us no reason to disturb that finding.

Fisher–Price also offered circumstantial evidence of copying. Roman's testimony provided a basis to conclude that Well–Made had access to the Puffalump Kids dolls. In addition, Fisher–Price's employees testified in detail how the Baby Dolly Mine bears an uncanny resemblance to the Puffalump Kids doll in terms of appearance, dimension, design, and construction. Thus, we find that Fisher–Price met its burden to show actual copying.

■ Parrotry does not always mean piracy, however. The plaintiff must also show illegality, and this requires a sharper focus: the court must find a substantial similarity between the *protectible* elements of the two works. That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea. *See Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2d Cir.1980). The means of expression are the "artistic" aspects of a work; the "mechanical" or "utilitarian" features are not protectible. *Id.* at 913. *See, e.g., Laureyssens,* 964 F.2d at 141 (the protectible elements of an interlocking-piece puzzle that can be assembled to form a cube are the shapes of the pieces; the concept of a cube puzzle is not protected by copyright).

Determining whether two objects look similar is not a particularly demanding task; but divining whether protectible elements of two works are substantially similar is an inexact science. As Judge Learned Hand recognized:

> Obviously, no principle can be stated as to when an imitator has gone beyond copying the "idea," and has borrowed its "expression." ... No one disputes that the copyright extends beyond a photographic reproduction of the design, but one cannot say how far an imitator must depart from an undeviating reproduction to escape infringement.

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960). We focus on whether an ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other. *See Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 765 (2d Cir.1991). Where, as here, we compare products that have both protectible and unprotectible elements, we must exclude comparison of the unprotectible elements from our application of the ordinary observer test. *See Laureyssens,* 964 F.2d at 141 (referring to this as "the more discerning ordinary observer test"). Because substantial similarity is the ultimate issue, we review the district court's finding on that issue *de novo* and include our own visual comparison in the analysis. *See Folio Impressions,* 937 F.2d at 766. *Cf. Paddington Corp. v. Attiki Importers,* 996 F.2d 577, 584–85 (2d Cir.1993) (in trademark dispute, district court's similarity

determination is reviewed for clear error because ultimate issue is likelihood of confusion).

Well–Made argues that the district court went astray when it found that the dolls were substantially similar because the court compared the unprotectible elements of the dolls.

As to the human dolls, we reject Well–Made's argument. Our *de novo* comparison of the dolls' protectible features convinces us that an ordinary observer would consider them substantially similar. Both sport the same bright, painted eyes, the same skyward gaze, the same knobby nose, and the same cherubic smile. Both have oversized heads that feature soft vinyl faces and curly tufts of hair peeking out beneath lace-frilled hoods. These dolls do not merely share features that are common to all dolls; they contain virtually identical expressions of those features. In short, Baby Dolly Mine expresses the idea of "doll" in a way that is almost indistinguishable from the expression in the Puffalump Kids doll.

■ We accept Well–Made's argument as to the mouse dolls, however, because their protectible elements are substantially *dissimilar*. While these dolls have similar body types, the artistic work on the faces is entirely distinct: Well–Made's mouse has large, oval, sleepy eyes, an open-mouthed smile, whiskers, and exaggerated puffy cheeks. Its head is shaped like a parabola. Overall, Well–Made's doll conveys the impression of an etherized rabbit, not a mouse. In contrast, Fisher–Price's mouse has small, round, beady eyes, a thin mouth, and no whiskers or cheeks. Its head is flatter and rounder than the Tender Tots doll's. True, Fisher–Price's doll does not much resemble a mouse either; however, it looks more like a bear cub than a rabbit.

Accordingly, the district court properly concluded that Fisher–Price was likely to succeed on its claim that Baby Dolly Mine infringed its Puffalump Kids copyright, but erred in finding the Tender Tots mouse infringed the Baby Puffalumps copyright.

## II.  *Irreparable Harm*

Well–Made also argues that Fisher–Price failed to demonstrate that the Baby Dolly Mine would cause irreparable harm without the injunction. We disagree.

■ Normally, when a copyright is infringed, irreparable harm is presumed; this is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways. *See Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 101 (2d Cir.1992); *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971) (Friendly, J.). "[C]onfusion may cause purchasers to refrain from buying either product and to turn to those of other competitors.... Furthermore, if an infringer's product is of poor quality, ... a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market." *Id.*

This is only a presumption, however, and it vanishes if the copyright holder unreasonably delays prosecuting his infringement claim. *Bourne*, 976 F.2d at 101. As we have stated in the analogous context of trademark infringement, "[l]ack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm...." *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985) (per curiam). *See Citibank*, 756 F.2d at 276 ("[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," and a delay in enforcement "tends to indicate at least a reduced need for such drastic, speedy action").

Delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is. *See Clifford Ross Co. v. Nelvana, Ltd.*, 710 F.Supp. 517, 521 (S.D.N.Y.), *aff'd without opinion*, 883 F.2d 1022 (2d Cir.1989); *Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 435 (S.D.N.Y.1980). Likewise, a delay caused by a plaintiff's good faith efforts to investigate an infringement should not rebut the presumption. *See King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992) (author's eight-month delay in filing

claim did not rebut presumption of irreparable harm because he spent that time trying to obtain a copy of the infringing screenplay and movie).

The question, therefore, is whether Fisher–Price's delay of six months before suing for an injunction was reasonable. We find that it was. In June 1992, Fisher–Price heard that Well–Made was making Christmas dolls that resembled Puffalump Kids. This rumor spurred Fisher–Price to notify its salesforce to search toy stores for a Baby Dolly Mine Christmas doll. The search was fruitless until November. Once it acquired the doll, Fisher–Price examined it to determine the extent of the infringement. Fisher–Price then obtained a Well–Made sales sheet, which alerted it to the fact that Well–Made was also making dolls that resembled the regular Puffalump Kids. Fisher–Price sued Well–Made less than two weeks after its examination of the Christmas doll, and almost simultaneously with receipt of the sales sheet. This can hardly be characterized as unreasonable delay and, accordingly, Fisher–Price deserved the presumption of irreparable harm.[1]

## CONCLUSION

We affirm that part of the injunction order that concerns Well–Made's Baby Dolly Mine baby doll, but vacate that part concerning the Tender Tots mouse doll.

AFFIRMED in part; VACATED in part.

---

1. The delay surrounding prosecution of the mouse doll claim, however, cannot so easily be explained. Fisher–Price obtained a copy of Well–Made's mouse in late September 1992, but did not sue for infringement until mid-December.

Fisher–Price has offered no explanation for this three-month delay. If Fisher–Price had truly been concerned that the Tender Tots mouse doll would harm it in the toy market, it is inconceivable that Fisher–Price would have waited until the middle of December—with the Christmas season upon it—to seek an injunction.

Nevertheless, because Fisher–Price failed to show the mouse dolls were substantially similar, we need not address whether Fisher–Price unreasonably delayed bringing this claim.