Chapman ROBERTS and Trebor Productions, Inc., Plaintiffs,

v.

ATLANTIC RECORDING CORPORATION, the L & S Broadway Company and the L & S Broadway Company Limited Partnership, Defendants.

No. 95 Civ. 3524 (SAS).

United States District Court,
S.D. New York.

May 22, 1995.

Robert E. Turtz, Weiner Lesniak, Parsippany, NJ (Speiser, Krause, Madole & Nolan,

New York City, of Counsel), for Chapman Roberts and Trebor Productions, Inc.

Gary B. Baker, Richard M. Hirsch, New York City, for defendant Atlantic Recording Corp.

James E. Hough, David S. Berg, Morrison & Foerster, New York City, for defendants L & S Broadway Co. and L & S Broadway Co. Ltd. Partnership.

*OPINION AND ORDER*

SCHEINDLIN, District Judge:

## I. INTRODUCTION

Plaintiff Chapman Roberts ("Roberts") is a musical arranger for the currently running Broadway show "Smokey Joe's Cafe" (the "Play")[1] pursuant to an Agreement entered into by Roberts and defendant L & S Broadway Company ("L & S") on May 1, 1994. The cast album for the Play is to be released by defendant Atlantic Recording Corp. ("Atlantic") on or about May 26, 1995. Roberts and plaintiff Trebor Productions Inc. ("Trebor")[2] have moved by Order To Show Cause, for a Temporary Restraining Order ("TRO") and a Preliminary Injunction ("PI") to enjoin the album's release asserting it infringes on Roberts' copyright of the vocal arrangements.[3]

## II. FACTUAL BACKGROUND

### A. *The Agreement*

Under the May 1, 1994 Agreement between Roberts and L & S,[4] Roberts was retained as the Play's vocal arranger and was responsible for creating the arrangements for all the vocal numbers in the Play. *See* Exhibit A to Complaint.

The Agreement gave L & S certain rights to use Roberts' vocal arrangements:

1. Smokey Joe's Cafe was recently nominated for seven (7) Tony Awards.

2. Trebor is a New York corporation wholly owned by Roberts.

3. Plaintiffs' Complaint also seeks compensatory and punitive damages for copyright infringement and unfair trade practices as well as a judgment declaring a portion of the May 1 Agreement void. These issues will not be addressed in this Order.

Vocal Arranger's orchestrations may be used by Producer without compensation to Vocal Arranger in connection with (a) an archival taping or filming or documentary on "The Making of The Leiber & Stoller Project"; (b) television commercials for The Leiber and Stoller Project; (c) newscasts and reviews; (d) performances on talk and/or variety shows and (e) award ceremonies.

*Id.* at ¶ 5.

The Agreement also reserved certain rights in the arrangements to Roberts:

... Under no circumstances (other than those specified herein) may his [Roberts'] vocal arrangements be performed, transcribed, recreated, copied, published or recorded outside of theatrical presentations without his express permission, approval and compensation. These rights, when his arrangements are used by the Producer or with the Producer's authorization, include cast albums, use on television, cable television, radio, motion pictures, cassettes, videocassettes, videodiscs, or any other medium in use or yet to be invented.

*Id.* at ¶ 8.

As to any use of the vocal arrangements which was not specifically granted to L & S or reserved for Roberts, the Agreement required the parties to negotiate for such use in good faith:

Subsequent Use: Any use of the vocal arrangements not specifically provided herein shall be negotiated in good faith and will be in keeping with industry standards for Broadway cast albums or the appropriate non-live performance uses.

*Id.* at ¶ 4.

### B. *The State Court Action*

What transpired after the Agreement was signed is in dispute. Roberts contends that

4. L & S subsequently assigned its right in the Agreement to defendant L & S Broadway Company Limited Partnership (the "Producer" or "L & S L.P."). L & S L.P. is the current owner of the theatrical production rights to the Play. The Play was referred to in the Agreement as "The Leiber & Stoller Project." It later became known as "Baby That's Rock 'N' Roll" and is now known as "Smokey Joe's Cafe."

he worked to create appropriate arrangements for the vocal numbers in the Play and discharged all of his responsibilities under the Agreement. *See* Complaint at ¶ 12. Roberts also contends that during the months of May and June, 1994, L & S and the Play's producers, Jujamcyn, Richard Frankel Productions and Scorpio, repeatedly interfered with his "creative efforts, harassed and intimidated him, denied him adequate rehearsal and developmental time with the Play's cast [and] tried to effect his voluntary resignation."[5] *See* Brief in Support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, at 3. Roberts asserts that ultimately L & S wrongfully terminated the Agreement and his status as vocal arranger in June, 1994, and that the Play's producers willfully caused the breach. *See* Complaint at ¶ 13.

In July, 1994, as a result of the alleged breach, plaintiffs commenced an action in the Supreme Court of New York, New York County, titled *Chapman Roberts and Trebor Productions, Inc v. The L & S Broadway Company, Jujamcyn Theaters Productions Inc., Richard Frankel Productions, Inc. and Richard Frankel,* Index No. 94119558. *See* Exhibit B to Complaint.

The Complaint in the state action (the "State Complaint") sought:

(1) damages for breach of the Agreement;

(2) a declaration that the Agreement had been repudiated and wrongfully terminated by the defendants thereby relieving plaintiffs of any further obligations under the Agreement;

(3) damages for assault and harassment; and

(4) a temporary restraining order and preliminary and permanent injunctions against defendants, preventing them from using plaintiff's name in connection with the Play and from making any changes in Roberts' vocal arrangements.

By Order *dated July 22, 1994,* Justice Leland DeGrasse directed that all matters relating to the State Complaint, except the third cause of action which alleged assault and harassment, be submitted to arbitration pursuant to the arbitration clause in the Agreement.[6] *See* Exhibit C to Complaint. Despite this Order, plaintiffs *never* initiated an arbitration with respect to the remainder of their claims.

Plaintiffs' application for a preliminary injunction was granted by Justice DeGrasse "only to the extent that defendants are preliminarily enjoined from using plaintiff's name in connection with . . . [the Play] pending the designation of arbitrators to be selected pursuant to this order." Declining to enjoin defendants' actions any further, Justice DeGrasse stated

> A balancing of the equities does not favor preliminarily enjoining defendants from making use of plaintiff's vocal arrangements or any changes therein. The play is now in developmental production and it has been demonstrated that such relief would effectively cause its closing.

## C. The Pending Arbitration

Defendants contend that Roberts breached the Agreement by failing to participate in rehearsals of the Play and stopped work in mid-June, ultimately completing only one-half of the vocal arrangements. Defendants' Memorandum of Law in Opposition to a Temporary Restraining Order, at 2. Defendants further assert that after Roberts breached the Agreement in June, 1994, they tried to negotiate in good faith for the use of the arrangements in the cast album but Roberts refused to negotiate. *Id.*

On March 7, 1995, plaintiffs sent a letter to defendants which stated that they would seek injunctive relief against defendants' use of the arrangements in the cast album.[7] *See*

---

**5.** Jujamcyn, Richard Frankel Productions and Scorpio are New York Corporations who are general partners of defendant L & S L.P. *See* Complaint at 3.

**6.** Justice DeGrasse severed the third cause of action and ordered it transferred to the Civil Court of the City of New York where it is now pending.

**7.** The March 7th letter referred to another letter dated February 28, 1995, in which plaintiffs stated they would seek injunctive relief against defendants to enjoin the use of Roberts' arrangements on the cast album.

Exhibit E to Complaint. Defendants responded the same day by letter in which they stated that Roberts refused to participate in good faith negotiations over the use of the arrangements in the cast album as required by Paragraph 4 of the Agreement. *See* Exhibit B to Affidavit of James E. Hough ("Hough Aff.") dated May 18, 1995. In addition, the defendants' letter stated that because of Roberts' inaction and refusal to participate in negotiations, they would have no choice but to commence arbitration proceedings themselves and that they hoped plaintiffs would cooperate in making the proceedings as expeditious as possible so as to achieve a resolution of the arbitration before the release of the cast album. *Id.*

On March 9, 1995, L & S L.P., as assignee of the Agreement, commenced arbitration proceedings before the American Arbitration Association. Plaintiffs introduced the substance of the State Complaint by way of counterclaim. A preliminary hearing was held on May 18, 1995.

In their Demand For Arbitration (the "Demand"), defendants asserted that they needed an immediate determination of an appropriate fee for the use of Roberts' vocal arrangements in the cast album because the first recording session for the album had already been held on March 6, 1995. *See* Exhibit A to Hough Aff. at ¶ 36–40. In addition, the defendants' Demand stated that immediate relief was needed because the cast album was scheduled for release on or about May 15, 1995 and that approximately $250,-000 would be invested by defendants to record and manufacture it. When requested by the arbitrator to give a list of inconvenient dates for the arbitration hearing, plaintiffs responded that the actual scheduling of a hearing should wait until an administrative conference had been held to resolve issues concerning documentary discovery, depositions and evidentiary matters. *See* Exhibit C to Hough Aff. Similarly, plaintiffs have objected to two appointed arbitrators, in one instance resulting in the cancellation of hearings scheduled for May 9–11. *See* Exhibit F to Hough Aff. Most recently, plaintiffs requested that arbitration hearings be postponed to mid-June, well after the scheduled

release date of the cast album. *See* Exhibit H to Hough Aff.

By letter dated April 24, 1995, plaintiffs told defendant Atlantic that the theatrical producers did not have the right to use Roberts' arrangements in a cast album and therefore could not convey such rights to Atlantic. In this letter, the plaintiffs also stated

> Notwithstanding the foregoing Mr. Roberts and Trebor Productions, Inc. are eager to resolve this matter without resorting to litigation, and in a way which will permit the release of the cast album as scheduled. Accordingly, without prejudice to the positions which we have set forth above and which we will advance if litigation is required, we are submitting to you our clients' invoice for vocal arrangements used in the production of the cast album. Payment of the invoice and inclusion of appropriate billing credit on all album materials will resolve this matter. **If the invoice remains unpaid and assurances of appropriate billing not provided by May 5, 1995, we will assume that this matter cannot be amicably be resolved, and we will commence litigation thereafter without further notice.**

Exhibit F to Complaint (emphasis added). On May 12, 1995, plaintiffs wrote the Arbitrator asserting that she did not have the jurisdiction to consider the issues relating to the improper making and intended release of the cast album and that Roberts would proceed by an action seeking injunctive relief. *See* Exhibit D to Hough Aff.

## III. DISCUSSION

██ The standards for a TRO are the same as those governing the granting of preliminary injunctive relief. *See Schiavone Construction Co. v. New York City Transit Authority,* 593 F.Supp. 1257, 1261 (S.D.N.Y. 1984). In order to obtain a preliminary injunction in the Second Circuit a party must demonstrate irreparable harm, and either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in its favor. *Polymer*

*Technology Corp. v. Mimran,* 37 F.3d 74 (2d Cir.1994) citing *Coca Cola Co. v. Tropicana Prods. Inc.,* 690 F.2d 312, 314–15 (2d Cir. 1982).

### A. *Presumption of Irreparable Injury*

In the case of copyright infringement, irreparable harm is usually presumed because the confusion created in the marketplace will cause irreparable damage to the copyright holder. *See Fisher Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d 119 (2d Cir.1994); *Bourne Co. v. Tower Records, Inc.,* 976 F.2d 99, 101 (2d Cir.1992); *Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971). This presumption, however, disappears "if the copyright holder unreasonably delays prosecuting his infringement claim," *Fisher Price,* 25 F.3d at 124, because injunctive relief is premised on the need for quick action to preserve a party's rights and delay in enforcing those rights indicates a reduced need for such extreme action. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985).

Plaintiffs assert that the defendants use of their vocal arrangements in the making, sale or distribution of a cast album has infringed their copyright in those works.[8] Because plaintiffs allege copyright infringement, they are entitled to the presumption of irreparable harm. Plaintiffs' delay in seeking this TRO, however, rebuts this presumption. *See Bourne Co.,* 976 F.2d at 101.

Plaintiffs were definitely aware as of March 7, 1995, that defendants planned to use Roberts' arrangements in the cast album. It was on that day that plaintiffs advised defendants in writing that they would seek injunctive relief if the cast album was produced.[9] Plaintiffs were also aware by March 9, 1995—the date defendants made their Demand for Arbitration—that Atlantic planned to release the cast album on or about May 15, 1995. Plaintiffs did nothing at that point to enforce their rights.[10] To the contrary, it was L & S L.P., the producer, who commenced the arbitration on March 9, 1995. Plaintiffs were aware that L & S L.P. sought to have the cast album dispute settled in arbitration, and that Defendants' Demand For Arbitration included a request for immediate relief with respect to the album issue. Yet, plaintiffs not only failed to expedite the arbitration, but in fact asked for a delay of the preliminary hearing until an administrative conference could be held on discovery issues. Plaintiffs then waited until May 12, 1995, to dispute the arbitrator's jurisdiction over the album dispute.[11]

Plaintiffs stated in their April 24 letter that they would commence litigation if the album dispute had not been resolved by May 5, 1995. However, they waited until May 17, 1995, twelve days after their stated "deadline", to bring the current motion. In the twelve days plaintiffs delayed in bringing their request for relief, defendants might not have completed production and shipment of 18,000 CDs and cassettes. Instead, plaintiffs sought relief less than a week before the release of the cast album, at the precise moment when an injunction would cause defendants the greatest possible harm.

Plaintiffs have known since March 9, 1995 (and probably since February 28, 1995) that defendants planned to use Roberts' arrange-

---

8. Plaintiffs have not yet obtained a valid copyright on the arrangements, though they have applied for registration of the copyright. Defendants contend that Roberts' arrangements cannot be copyrighted because they do not meet the requirements for obtaining a copyright of derivative works. Because plaintiffs are not entitled to a TRO even if they did have a valid copyright, I do not address defendants' contentions on this issue.

9. The March 7 letter indicates that plaintiffs knew of defendants' intent to use their arrangements in the cast album as of February 28, 1995.

10. Plaintiffs did not even apply for registration of their alleged copyright with respect to the arrangements until May 15, 1995. *See* Plaintiffs' Supp.Mem. at 5.

11. Under N.Y.Civ.Prac.L. & R. § 7503 (McKinney 1993), plaintiffs have waived their right to object to the arbitration of claims concerning the production of the cast album. Section 7503 states that a party served with a demand to arbitrate must seek a stay of the arbitration within twenty days of service of the demand. *A fortiori,* a failure to apply for a stay waives any objection to the arbitration of a claim in the pending arbitration.

ments in the cast album and that the album was set to be released around May 15. Instead of proceeding expeditiously, plaintiffs have dragged their feet in the arbitration of the album dispute. Assuming, arguendo, that plaintiffs had participated diligently in the arbitration, they still waited until twelve days after *their own* cut-off date to bring the current motion. The plaintiffs' delay in bringing the current motion for a TRO cannot, under these circumstances, be considered reasonable. *See Fisher Price, Inc.,* 25 F.3d at 125; *Bourne Co.,* 976 F.2d at 101; *Citibank N.A. v. Citytrust,* 756 F.2d at 276.

## B. *Proof of Irreparable Injury*

■ Although the Court declines to *presume* that irreparable harm will occur as a result of the scheduled release of the album, plaintiffs may yet prevail if they sustain their burden of demonstrating irreparable harm. Irreparable injury is an "injury for which a monetary award cannot be adequate compensation." *Loveridge v. Pendleton Woolen Mills, Inc.,* 788 F.2d 914, 917 (2d Cir.1986) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Similarly, injunctive relief should not be granted "where money damages are adequate compensation." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). Because injunctive relief is an extraordinary remedy a party seeking such relief must show a likelihood of irreparable injury, not merely a possibility of irreparable injury, and "likelihood sets, of course, a higher standard than possibility." *Id.* at 79–80.

■ In plaintiffs' April 24 letter, they state that "Payment of the invoice and inclusion of appropriate billing credit on all album materials will resolve this matter." If the album dispute is decided in plaintiffs' favor and defendants pay the invoice amount, the only remaining injury to Roberts would be a lack of billing credit. Defendants agreed at oral argument of the request for a TRO to credit Roberts on any future CD's or cas-

settes. Defendants cannot, however, change the credits on the 18,000 units which have already been manufactured and shipped. Roberts' injury, therefore, would ultimately be the lack of billing credit on the 18,000 CD's and cassettes already manufactured.

However, Roberts did not receive billing credit for the 18,000 units because of *his own actions.* As noted above, Justice DeGrasse granted Roberts' motion for a preliminary injunction on July 22, 1994. This injunction enjoined defendants from using his name "in connection with" the Play. Roberts claims that irreparable injury flows from defendants' failure to display his name on the cast albums. Plaintiffs, however, sought and received an injunction *prohibiting* defendants from using his name "in connection with" the Play. For plaintiffs now to claim that he is irreparably harmed by defendants' failure to use his name amounts to unclean hands. *See Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 874 (E.D.N.Y.1978). As a restraining order is a form of equitable relief, Roberts' previous request that his name not be used precludes him from claiming irreparable harm as a result of defendants' failure to use his name.

Because plaintiffs cannot prove that there is a likelihood of irreparable harm if the cast album is released as scheduled, plaintiffs' application for a TRO is denied.

## C. *Remaining Elements for Injunctive Relief*

Plaintiff has failed to make the showing of irreparable harm necessary to grant a TRO. Because a showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief, the Court need not address the remaining elements necessary to obtain such relief. *See Reuters, Ltd. v. United Press International, Inc.,* 903 F.2d 904, 907 (2d Cir.1990).[12]

---

12. In order to succeed on the merits, plaintiffs must show (1) ownership of valid copyrights; and (2) unauthorized copying. The court is unable to conclude, based on the current record, that plaintiffs would prevail on either prong of the test. *See* Def.Mem. at pp. 11–14 and Def. Supp.Mem. at pp. 5–10. Moreover, there is no doubt that the balance of hardships tips decidedly in defendants' favor as they would be irreparably injured if the cast album were not released in this critical period between the Tony nominations and the Tony Awards.

## IV. CONCLUSION

Plaintiffs have failed to sustain their burden that they will suffer irreparable injury from the release of the cast album. Because proof of irreparable injury is a prerequisite to the issuance of a Temporary Restraining Order, the plaintiffs' motion is denied. For the same reasons, the court will not preliminarily enjoin the release, distribution or sale of the cast album.[13] If plaintiffs have any claim in this court, it is for money damages. Defendants' motion to stay this case pending the outcome of the arbitration will be heard at the earliest possible time.

SO ORDERED.

---

13. Neither party has requested an evidentiary hearing. Such a hearing is not required, moreover, if grounds exist to deny injunctive relief which do not require resolving any disputed issues of fact. *See Redac Project 6426, Inc. v. Allstate Ins. Co.,* 402 F.2d 789, 790 (2d Cir.1968); *Sugarhill Records Ltd. v. Motown Record Corp.,* 570 F.Supp. 1217, 1222 (S.D.N.Y.1983).