**In re INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.**

**This Document Applies To: CSU HOLDINGS, INC., et al.**

**v.**

**XEROX.**

**Civil Action No. MDL–1021 (94–2102).**

United States District Court,
D. Kansas.

Dec. 11, 1995.

Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS, P. John Owen, Lori R. Schultz, Morrison & Hecker, Kansas City, MO, Michael C. Manning, Morrison & Hecker, Phoenix, AZ, for CSU Holdings Inc., Copier Services Unlimited, Inc., and Copier Service Unlimited of St. Louis, Inc.

James A. Hennefer, San Francisco, CA, Maxwell M. Blecher, Los Angeles, CA, for Acquisition Specialists, Inc., Tecspec, Inc., a Texas Corporation, Consolidated Photo Copy, Inc., Copier Rebuild Center, Inc. and CPO Ltd.

James A. Hennefer, San Francisco, CA, Maxwell M. Blecher, Los Angeles, CA, for Gradwell Company, Inc., Graphic Corporation of Alabama, International Business Equipment, Inc., Laser Resources Inc., Laser Resources of Minnesota, Inc., Laser Solutions, Inc., Laser Support and Engineering, Inc., Marathon Copier Service, Inc., Nationwide Technologies, Inc., Reprographics Resources Systems, Inc., Resources Systems, Inc., Suntone Industries, Inc., Technicial Duplication Services, Inc., X–Tech Systems Inc., Xer–Dox Inc. and Xerographic Copies Services, Inc.

James A. Hennefer, San Francisco, CA, Jack M. Bernard, Philadelphia, PA, for Creative Copier Services, Inc.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Peter W. Marshall, Xerox Corporation, Stamford, CT, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Xerox Corporation.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter came before the court for hearing October 12, 1995, on Xerox's motion for a preliminary injunction against counterclaim defendant CSU Holdings, Inc. (Doc. # 109). Pursuant to the court's request at the hearing, Xerox submitted a modified proposed order clarifying and narrowing the relief requested (Doc. # 158). For the reasons set forth below, Xerox's motion for a preliminary injunction will be granted as modified. After carefully considering the parties' briefs, oral arguments, testimony at the hearing, and exhibits, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

**1540**

*Findings of Fact*

1. Counterclaimant Xerox Corporation ("Xerox") is a New York corporation with its principal offices in Stamford, Connecticut. Counterclaim defendants Copier Services Unlimited ("CSU") Holdings, Inc., is a Kansas corporation located in Kansas City, Kansas. CSU Kansas City is a Kansas corporation with its principal place of business at 9261 Cody, Overland Park, Kansas. CSU St. Louis is a Missouri corporation with its principal place of business at 2275 Cassens Drive in Fenton, Missouri. Counterclaim defendants will be referred to collectively as "CSU."

2. CSU filed suit against Xerox in this court seeking injunctive relief and damages for antitrust violations pertaining to Xerox's allegedly restrictive parts policy. Xerox filed second amended counterclaims alleging, *inter alia*, copyright infringement by CSU. Only the copyright infringement counterclaims are implicated by the instant motion for preliminary injunction.

3. Xerox is in the business of inventing, manufacturing, selling, and servicing copiers and printers. Xerox also manufactures and sells parts for Xerox copiers and printers.

4. CSU is a competitor of Xerox in the sale and servicing of copiers and printers.

5. Xerox's 5090 copier, among other Xerox copier machines, utilizes Xerox-developed operating system and diagnostic software, which are contained on floppy disks. Operating system software directs the operation of the machine, while diagnostic software assists in diagnosing machine failures. There are two types of diagnostic software used on a Xerox 5090 copier—that which is resident and, therefore, permanent on the hard drive of the machine ("resident diagnostic software") and that which is installed temporarily from portable floppy disks ("diagnostic disk software" and "diagnostic utility disks").

Although Xerox has brought claims alleging that CSU's use of all types of copyrighted software infringes Xerox's copyrights, Xerox is not presently seeking to enjoin CSU's use of any resident software. Xerox is only seeking to enjoin CSU from copyright infringement with respect to: (1) Xerox diagnostic software on floppy disks; and (2) unauthorized copies of Xerox manuals.

6. Xerox is the sole owner and/or assignee of all right, title, and interest in and to the copyrights on all versions of diagnostic software for the Xerox 5090 copier. Xerox's copyrights are duly registered, pursuant to the Copyright Act, 17 U.S.C. § 410.

7. CSU utilizes Xerox diagnostic software in providing maintenance service for Xerox 5090 copiers and 4050, 4090, and 4650 laser printers. Neither CSU nor its customers have purchased a license to use Xerox's copyrighted software. Xerox will sell CSU or its customer a license to use Xerox's copyrighted diagnostic software for $4,080 per copier.

8. CSU officials have admitted copying Xerox copyrighted manuals and software and that they knew that the materials were copyrighted. They assert that at the time the materials were copied, copying was one of the only means by which they could acquire the materials.

9. Xerox did not have concrete evidence, until recent discovery in the instant case, that CSU was infringing its copyrights in the particular manner Xerox now seeks to enjoin. There is strong evidence that Xerox may have suspected infringement by CSU for quite some time, and at least as early as November 30, 1994, when it sought leave to bring its copyright infringement counterclaims, Xerox knew of CSU's allegedly infringing conduct. Nevertheless, the court finds that actual evidence to warrant the bringing of the instant motion for preliminary relief, i.e., admissions by CSU officials of ongoing unauthorized copying of Xerox manuals and diagnostic software disks, was not known by Xerox until recent depositions in this case.

*Conclusions of Law*

This court has jurisdiction over the copyright infringement counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338(a). Venue lies pursuant to 28 U.S.C. § 1400(a).

We are authorized by the Copyright Act to "grant temporary and final injunctions on such terms" as we deem "reasonable to prevent or restrain infringement of a copyright."

17 U.S.C. § 502(a). *See Autoskill Inc. v. National Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993).

■ In addition, to obtain preliminary injunctive relief, Xerox must establish each of the following factors: (1) a substantial likelihood that Xerox will eventually prevail on the merits; (2) Xerox will suffer irreparable injury unless injunctive relief is granted; (3) the threatened injury to Xerox outweighs whatever damage the proposed injunction may cause CSU; and (4) the injunction, if granted, will not be adverse to the public interest. *See id.* (citations omitted).

*Likelihood of success on the merits*

■ To demonstrate a substantial likelihood of success on the merits, Xerox is required to present "a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Id.* Xerox is not required to show to an absolute certainty that it will prevail. *See id.* Rather, if the other three requirements for a preliminary injunction are satisfied, it is enough if Xerox raises "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

■ To establish a likelihood of success, Xerox must present a prima facie case of copyright infringement. This requires Xerox to show: (1) ownership of a valid copyright, and (2) copying. *See id.* Both prongs of Xerox's prima facie case are easily met in this case.

■ The Copyright Act provides that a certificate of registration of a copyright "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). By presenting the registration certificates for the copyrights in question, Xerox shifts the burden to CSU to dispute the validity of the copyrights. *See Autoskill,* 994 F.2d at 1487.

■ Xerox has also established copying by CSU. We agree with the court in *MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 519 (9th Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994), that transferring a computer program from a storage device to a computer's RAM constitutes a copy for purposes of copyright law. *See also NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 235 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995) ("loading software into a computer constitutes the creation of a copy under the Copyright Act"); *Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 260 (5th Cir.1988) ("the act of loading a program from a medium of storage into a computer's memory creates a copy of the program"); *Advanced Computer Servs. v. MAI Sys. Corp.,* 845 F.Supp. 356, 363 (E.D.Va.1994) (where "a copyrighted program is loaded into RAM and maintained there for minutes or longer, the RAM representation of the program is sufficiently 'fixed' to constitute a 'copy' under the Act"); *Triad Sys. Corp. v. Southeastern Express Co.,* No. C 92 1539–FMS, 1994 WL 446049 at *2 (N.D.Cal. March 18, 1994), *aff'd in pertinent part,* 64 F.3d 1330 (9th Cir. 1995), *petition for cert. filed,* (U.S. November 24, 1995) (No. 95–808) (loading the operating system software into a computer's RAM "necessarily creates a 'copy' in the computer's internal memory").

CSU does not seriously challenge that Xerox holds valid copyrights or that CSU's use of the diagnostic software constitutes copying. Rather, CSU alleges that Xerox cannot enforce its copyrights because it is misusing the copyrights to perpetrate antitrust violations. The misuse defense, first recognized in the patent context in *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), has been discussed by several courts in the copyright context as well. *See Atari Games Corp. v. Nintendo of America, Inc.,* 975 F.2d 832, 846 (Fed.Cir. 1992) (listing numerous circuit court cases on the misuse defense); *Service & Training, Inc. v. Data Gen., Inc.,* 963 F.2d 680, 690 (4th Cir.1992) (finding no misuse); *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 976–80 (4th Cir.1990) (finding misuse); *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285, 290–91 (10th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975) (discussing the conflict of policies between "preventing piracy of copyrighted matter" and "enforcing the antitrust laws" and finding no misuse).

■ Generally, the exercise of one's rights under the Patent and Copyright Acts, even by refusing to license or sell one's protected work to a competitor, does not automatically equate with an antitrust violation. *See, e.g., Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 546, 76 L.Ed. 1010 (1932) (A copyright owner may refrain from "vending or licensing and content himself with simply exercising the right to exclude others from using his property."); *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1204 (2d Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982) (similar holding in patent arena); *Service & Training,* 963 F.2d at 686–88, 690 (copyright case) (selective licensing is not evidence of an illegal tying arrangement).

■ Indeed, a copyright owner possesses the *exclusive* right to sell, license, or otherwise distribute copies of a copyrighted work. *See* 17 U.S.C. § 106(3). In essence, a copyright provides the copyright holder with a legal monopoly. "[A] good faith effort to enforce one's copyright is not the type of exclusionary conduct condemned by [§] 2 of the Sherman Act." *Marks Music,* 497 F.2d at 291.

■ CSU asserts that Xerox ought not be permitted to enforce its exclusive rights under the Copyright Act because Xerox is misusing the copyrights to further its antitrust scheme. CSU relies heavily on the Fourth Circuit's opinion in *Lasercomb,* 911 F.2d at 970, one of the few courts to have found the misuse defense applicable. However, *Lasercomb* is readily distinguishable from the instant case and certainly does not convince the court that CSU can avoid a preliminary injunction against further infringement by invoking the misuse defense in the instant case.

*Lasercomb,* 911 F.2d at 978, involved a licensing agreement which restricted the licensee from independently creating a program using the idea embodied in the copyrighted software program. The court found that Lasercomb (the licensor) had misused its copyright by using the license to attempt to restrict independent creative expression: "Lasercomb is attempting to use its copyright in a manner adverse to the public policy embodied in copyright law" (i.e., to promote independent creative expression of an idea).

*Id.* "Misuse arises from Lasercomb's attempt to use its copyright in a particular expression, ... to control competition in an area outside the copyright." *Id.* at 979. *See also, Triad Sys. Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1337 (9th Cir.1995) (distinguishing *Lasercomb* on similar grounds).

Similar circumstances do not exist in the instant case. At least since June 1994, Xerox has offered to sell licenses for its diagnostic software. There is no evidence that Xerox's licensing agreement prohibits CSU from developing its own diagnostic software for Xerox copiers. Indeed, there is no evidence that CSU has ever attempted to develop its own software program, choosing instead to simply pirate Xerox's copyrighted work.

CSU urges that Xerox is including "intellectual property litigation in its arsenal of weapons, along with its restrictive Parts Policy, to defeat competition by independent service organizations ("ISOs") in order to maintain its monopoly in servicing high volume copiers and printers." CSU maintains that the license fee charged by Xerox is exhorbitant and that paying it will put CSU out of business. However, CSU's profit analysis is based on a scenario in which CSU does not pass any portion of the licensing fee on to its customers. CSU presently offers service at 20–25% below Xerox service prices. On the present record, it appears that even if CSU passes on *all* of the licensing fee to its customers, it will still be able to price its service at or below prices charged by Xerox.

"[A]nti-trust laws are designed to protect competition, not competitors." *Service & Training, Inc. v. Data Gen. Corp.,* 737 F.Supp. 334, 344 (D.Md.1990), *aff'd,* 963 F.2d 680 (4th Cir.1992). Moreover, CSU is not entitled to maintain its competitive edge by infringing Xerox's copyrights. *Autoskill,* 994 F.2d at 1498. We believe that Xerox is entitled to recoup the development costs of copyrighted material by charging a reasonable licensing fee to those who use the copyrighted work, without running afoul of the antitrust laws.

Exactly where the line of reasonableness is to be drawn with respect to a license fee for Xerox's copyrighted software and manuals,

need not be determined at this stage of the litigation. Xerox has presented evidence that significant resources went into developing the copyrighted software and manuals. From the testimony at the hearing, it is evident that Xerox's diagnostic software involves a very sophisticated computer program which creates significant savings in terms of repair and maintenance time and expense. The Xerox diagnostic software is obviously a very valuable resource to those involved in servicing Xerox equipment.

Xerox charges $4,080 per machine for a license to use the 5090 diagnostic software. Xerox sells manuals for approximately $400. Although CSU vehemently disputes the reasonableness of these fees, CSU has submitted no evidence that they are excessive. Moreover, even if we were to assume that Xerox's prices are excessive, we question whether excessive pricing alone constitutes copyright misuse, which triggers antitrust liability.

■ An exercise of rights under a copyright can lead to antitrust liability. In *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 2088 n. 29, 119 L.Ed.2d 265 (1992), the Supreme Court stated, "[t]he Court has held many times that power gained through some natural or legal advantage such as a patent, copyright, or business acumen can give rise to liability if a 'seller exploits his dominant position in one market to expand his empire into the next.'" In *Marks Music*, 497 F.2d at 290, the Tenth Circuit assumed *arguendo* that an antitrust violation is a defense in a copyright infringement action. The court also stated, "utilization of the courts in a manner which is in accordance with the spirit of the law continues to be exempt from the antitrust laws." *Id.* at 290–91. By negative implication, *Marks Music* suggests that a bad faith effort, contrary to the spirit of copyright and antitrust law, to enforce one's copyright is condemned by the Sherman Act. The *Lasercomb* court also said, "the attempted use of a copyright to violate antitrust law probably would give rise to a misuse of copyright defense." 911 F.2d at 978.

However, we are not aware of any court that has held that price alone is a basis for antitrust liability. Indeed, courts have held that ownership of intellectual property "enti-

tles the owner to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964); *Continental Cablevision v. American Elec. Power Co.*, 715 F.2d 1115, 1121 (6th Cir.1983) ("Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive."); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.*, 445 F.2d 84, 95 (7th Cir.1971) (patent case). Under this rationale, exorbitant pricing alone is not copyright misuse.

Perhaps exorbitant pricing, combined with other monopolistic conduct, may trigger antitrust liability. In *W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) (quoting *Brulotte*, 379 U.S. at 33, 85 S.Ct. at 179), the court stated, "*absent any overriding unlawful conduct*, 'a patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.'" In *Marks Music*, 497 F.2d at 291, the court spoke of balancing the conflicting policies implicated by the copyright and antitrust laws by "taking into account the comparative innocence or guilt of the parties, the moral character of their respective acts, the extent of harm to the public interest, [and] the penalty inflicted" if relief is denied.

Even if Xerox may ultimately be found to have used the copyrights as part of an overall restrictive parts policy aimed at snuffing out ISO competition, we do not believe this forecloses Xerox's entitlement to an injunction against CSU's continued copyright infringement in the interim. The present situation is that Xerox is offering its copyrighted manuals and licenses for its copyrighted diagnostic software for sale to CSU and other ISOs.

The Copyright Act mandates that CSU pay the fees charged by Xerox for the use of its copyrighted materials. Without a license, CSU's use of the diagnostic software to service Xerox copiers constitutes infringement. Similarly, CSU's copying of Xerox's copyrighted manuals constitutes infringement. If Xerox's manual prices or licensing fees are exorbitant and, if when combined with other monopolistic activity, they give rise to antitrust violations, CSU's remedy lies in damages on its antitrust claims, not blatant copy-

right infringement during the pendency of the resolution of the antitrust claims. *See, e.g., Service & Training,* 737 F.Supp. at 342 (citations omitted) ("[N]umerous courts have held that an alleged violation of the anti-trust laws, while perhaps affording a ground for affirmative relief, generally does not provide a defense to copyright infringement.").

We conclude that CSU's antitrust allegations against Xerox do not warrant denial of preliminary injunctive relief in this case. Xerox has established a reasonable likelihood of success on the merits of its copyright infringement claims.

*Irreparable Harm*

■ Although the Tenth Circuit has not ruled on the issue, the majority of circuits have held that irreparable harm may be presumed upon a prima facie showing of copyright infringement. *See Service & Training,* 963 F.2d at 690; *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,* 886 F.2d 1173, 1174 (9th Cir.1989); *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 611 (1st Cir.1988); *West Pub. Co. v. Mead Data Central, Inc.,* 799 F.2d 1219, 1229 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Atari, Inc. v. North Am. Philips Consumer Electronics Corp.,* 672 F.2d 607, 620 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

In *Autoskill,* 994 F.2d at 1498, the Tenth Circuit expressly declined to decide whether to adopt the irreparable harm presumption because evidence of a loss of uniqueness in the marketplace provided an independent ground for finding irreparable harm. CSU suggests that the *Autoskill* court expressly rejected the irreparable harm presumption and that irreparable harm must be shown by evidence of a loss of uniqueness in the marketplace or an inability to calculate damages. Citing *Autoskill,* 994 F.2d at 1498, CSU contends that injunctive relief should only be granted where a damage remedy is inadequate because damages cannot be calculated. CSU submits that because CSU has given Xerox a list of CSU's model 5090 copier

customers, any license fees due can be easily calculated. CSU argues that Xerox is already relying on its damages remedy with respect to a portion of its copyright infringement claims.

■ We acknowledge that although Xerox continues to allege that CSU's unlicensed use of resident operating and diagnostic software violates Xerox's copyrights, it does not seek to enjoin CSU's use of that software. Xerox has chosen instead to rely on its damage remedy and seek a permanent injunction relative to that copyrighted software at trial. However, Xerox's decision to rely on its damages remedy and only seek to enjoin a portion of CSU's conduct does not preclude a finding of irreparable harm. Even though the license fees for the copiers presently serviced by CSU are rather easily calculated, that damages remedy alone does not fully realize the value of Xerox's rights in its copyrighted materials.

In addition to the license fee, Xerox's copyright gives it a competitive advantage over competitors who do not have the copyrighted materials. It may very well be that when CSU is forced to compete with Xerox at more similar pricing, Xerox will pick up additional service accounts which will generate additional revenue. We have no way of calculating the value to Xerox of its enhanced ability to compete with CSU in the service market, and simply cannot determine the full damages stemming from CSU's alleged copyright infringement at this juncture. *See Encyclopaedia Britannica Educ. Corp. v. C.N. Crooks,* 447 F.Supp. 243, 247–48 (W.D.N.Y. 1978) (irreparable harm found where licensing agreements did not provide a clear measure of damages).

We believe that the presumption of irreparable harm is precisely directed at such a situation. As we have already discussed, Xerox is not legally required to license its copyrighted work. While refusal to license may implicate the antitrust laws if it is found to be anticompetitive conduct, the fact that licenses are presently offered (at what appears to be reasonable prices) weakens CSU's antitrust claim. Moreover, irreparable harm can be presumed, notwithstanding

that a portion of Xerox's damages can be easily calculated based on the license fee.

■ CSU also attempts to rebut the presumption of irreparable harm by arguing that Xerox unreasonably delayed bringing its motion for a preliminary injunction in that it knew about CSU's alleged copyright violations for years before seeking to enjoin CSU. CSU asserts that Xerox had such knowledge because CSU is one of Xerox's main competitors in the service market. CSU argues that because the software is required to service the equipment, Xerox knew for some time that CSU was servicing Xerox machines using the copyrighted software without a license.

Xerox counters that it did not have a good faith basis for seeking preliminary injunctive relief until recent depositions in this case when CSU officials admitted copying manuals and unlawfully obtaining and reproducing floppy disks containing copyrighted software. Xerox also points out that CSU had previously denied using copyrighted diagnostic software in performing service to customers.

■ Admittedly, delay may rebut the presumption of irreparable harm. *See, e.g., Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir.1995). However, delay caused by a copyright owner's good faith efforts to investigate the suspected infringement should not rebut the presumption. *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 124–25 (2d Cir.1994). Under all the circumstances, we do not believe that CSU has sufficiently rebutted the presumption of irreparable harm with its allegations that Xerox unreasonably delayed in seeking injunctive relief.

### Balance of Hardships

■ Xerox is required to demonstrate that the injury it will sustain if the injunction does not issue outweighs the potential harm the injunction will cause to CSU. *Autoskill*, 994 F.2d at 1498. CSU contends that enjoining it from continued infringement of Xerox's copyright will have a devastating impact on its business. We seriously question this as-

sertion because all of the evidence presented has been that this is true only if CSU does not pass on any of the license fees to its customers.

In any event, as the court in *Autoskill* stated, "even assuming the injunction would have such a devastating effect ... a knowing infringer cannot be 'permitted to construct its business around its infringement.'" *Id.* (quoting *Apple Computer, Inc. v. Franklin Computer Corp*, 714 F.2d 1240, 1255 (3d Cir. 1983)). The court's reasoning that "placing too much weight on this factor would reward infringers" is also particularly apropos in the instant case. In sum, the balance of hardships weighs in favor of Xerox's right to enforce its copyrights.

### Public Interest

■ Xerox is required to demonstrate that the issuance of the injunction is not adverse to the public interest. *Autoskill*, 994 F.2d at 1499. CSU seems to argue that issuance of a preliminary injunction is not in the public's best interest because Xerox is trying to use the copyright to put the ISOs out of business, and that once that is accomplished, Xerox will usurp monopolistic prices from the public. CSU also suggests that passing on the licensing fee to its customers is contrary to the public interest because it furthers Xerox's monopolistic activity by forcing the public to pay higher prices.

CSU has not presented any concrete evidence to support its claims.[1] On the present record, it is not apparent that the payment of the $4,080 license fee will, necessarily, put CSU out of business. It is also not evident that if CSU passes on some or all of the licensing fee to its customers, the higher prices paid by the public will exceed the true value of the service provided.

Moreover, upholding the rights of a copyright holder is generally regarded as being in the public interest. *Id.* We note that the injunction is narrowly tailored so as not to reach only the most blatant of CSU's alleged copyright infringement. Overall, the public interest is best served by the issuance of the

---

1. Throughout the course of this litigation, CSU has levelled accusations of monopolistic activity based on internal Xerox documents pertaining to ISO competition. While certainly relevant to CSU's antitrust claims, these documents do not affirmatively establish misuse by Xerox of its copyrights.

injunction to prohibit CSU from continuing to thumb its nose at the requirements of the Copyright Act.

*Conclusion*

■ We conclude that Xerox has met the requirements for the issuance of a preliminary injunction. An injunction is consistent with our authority under 17 U.S.C. § 502 in that it is necessary to prevent and restrain further infringement of Xerox's copyrights by CSU.

IT IS THEREFORE ORDERED that Xerox's motion for preliminary injunction (Doc. #109) is granted, on the condition that, pursuant to Federal Rule of Civil Procedure 65(c), Xerox post security, within fourteen (14) days, in the amount of $375,000 to assure payment to CSU of any damages incurred in the event Xerox does not ultimately prevail on its copyright infringement claims at trial.

IT IS FURTHER ORDERED that CSU shall, within ten (10) days of the posting of security in this matter, deliver to Xerox all unauthorized copies (whether made by CSU or acquired from unlicensed sources) of Xerox manuals and floppy disks containing diagnostic software for the 5090 copier which are in CSU's possession, custody, or control.

IT IS FURTHER ORDERED that CSU and its officers, agents, servants, employees, and any other persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, are hereby immediately restrained and enjoined, pending trial, from: (1) reproducing Xerox manuals and/or distributing unauthorized copies of Xerox manuals or substantial portions thereof; and (2) acquiring, using, or distributing, in the absence of a license from Xerox, any floppy disks or upgrade disks containing diagnostic software or diagnostic utility disks for the Xerox 5090 copier.